# THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# ASHEVILLE DIVISION
# CIVIL CASE NO. 1:15-cv-00205-MR

| | |
|---|---|
| AMANDA PARLIER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **MEMORANDUM OF** |
| vs. ) | **DECISION AND ORDER** |
| ) | |
| NANCY A. BERRYHILL, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**THIS MATTER** is before the Court on the Plaintiff's Motion for Summary Judgment [Doc. 10] and the Defendant's Motion for Summary Judgment [Doc. 14].

**I. PROCEDURAL HISTORY**

The Plaintiff Amanda Parlier protectively filed her application for disability insurance benefits on January 4, 2012, alleging an onset date of March 1, 2009.[1] [Transcript ("T.") 13, 152-53]. The Plaintiff's claim was denied initially and on reconsideration. [T. 13, 66-95, 100-09]. Upon the Plaintiff's request, a hearing was held on July 15, 2014, before Administrative

---

[1] The Plaintiff amended her alleged onset date to October 25, 2011, at the ALJ hearing. [T. 13].

Law Judge Kevin F. Foley ("ALJ Foley"). On August 15, 2014, ALJ Foley issued a partially favorable decision awarding the Plaintiff benefits from October 25, 2011 through August 30, 2013, but denying benefits for the period thereafter through the date of the decision. [T. 9-24]. The Appeals Council denied the Plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner. [T. 1-6]. The Plaintiff has exhausted all available administrative remedies, and this case is ripe for review pursuant to 42 U.S.C. § 405(g).

## II.    FACTUAL BACKGROUND

On October 26, 2011, the Plaintiff presented to an eye specialist complaining of pain and lost vision in her right eye. She was diagnosed with optic neuritis and referred to a neurologist. [T. 216-18]. On December 1, 2011, the Plaintiff was seen by neurologist Ryan Conrad, M.D., who noted on physical examination that the Plaintiff had weakness in her legs and hips bilaterally and that she complained of weakness, numbness, pain, dizziness, fatigue, and loss of vision. Dr. Conrad preliminarily diagnosed the Plaintiff with multiple sclerosis ("MS") but noted that such diagnosis would need to be confirmed. [T. 284-88]. A lumbar MRI performed on December 7, 2011, showed degenerative disc disease at L4-5 and L5-S1. [T. 239]. A lumbar puncture confirmed her diagnosis of MS. [T. 273]. The Plaintiff was started

2

on medications for MS, but she continued to complain of severe fatigue, headaches, night sweats, and nausea while on medication. [T. 290].

On June 26, 2012, Dr. Conrad noted that the Plaintiff complained of daily headaches and dizziness in addition to fatigue and worsening depression. [T. 318]. Objectively, the Plaintiff was noted to have an ataxic gait and problems with parasthesias in her legs. [T. 319]. On July 2, 2012, a residual functional capacity evaluation was performed indicating that she showed severe pain and gait deviations and fatigue when walking. [T. 328-29]. It was recommended that the Plaintiff use a cane when walking due to fatigue, weakness, and episodes of falling. [T. 329]. In 2013, the Plaintiff's gait and balance problems continued with objective signs of the inability to tandem walk, a positive Romberg test, and falling or veering to the right when standing and walking. [T. 471-504]. She also continued to have blurry vision due to optic neuritis. [T. 354-55].

Dr. Conrad provided a medical source statement on April 22, 2013, explaining that the Plaintiff's impairment would prevent her from sitting, standing, or walking for more than two hours at a time, and that she would need to take breaks of at least 15 minutes, every half hour. He further opined that she would rarely be able to lift up to ten pounds and would miss more than four days of work per month. [T. 468-70].

3

On August 30, 2013, the last date that the Plaintiff was seen by Dr. Conrad, it was noted that the Plaintiff still had showed objective signs of weakness in her legs as well as now in her arms, along with continued ataxic gait, fatigue, memory loss, depression, and parasthesias. [T. 473].

In October 2013, the Plaintiff lost her Medicaid insurance coverage. [T. 37]. After losing her insurance, the Plaintiff was unable to continue treatment with her treating physicians. On three occasions, however, she sought emergency treatment for conditions unrelated to MS. On October 8, 2013, the Plaintiff presented to the emergency room complaining of painful itching and burning of her neck for three to four days. She stated that she thought this could have been shingles, and that the pain was as high as a 10 out of 10. [T. 515-17]. The list of problems showed the Plaintiff's MS diagnosis as "confirmed," but the physical examination revolved around her neck pain complaint, and there was no mention of any tests related to her MS or relevant functional capacity. [Id.].

On February 17, 2014, the Plaintiff presented to the emergency room with abdominal pain and vomiting persisting for three days and was diagnosed with a urinary tract infection. [T. 505, 510]. The examination notes indicate that the Plaintiff reported a history of ovarian cysts, and that her mother had a history of ovarian cancer, which was her main concern.

4

[Id.]. Dr. Matthew K. Schwarz, M.D. performed a urinalysis and a transvaginal pelvic ultrasound. [T. 511]. There was no indication that Dr. Schwarz performed any other tests that would indicate anything regarding the Plaintiff's MS. [T. 505-12].

The Plaintiff returned for a third emergency room visit on April 8, 2014, complaining of an abscess on her face that was painful and had been present for three days. [T. 513]. She also complained of a decrease in vision in her left eye, which she explained was a symptom of her MS. [Id.]. The Plaintiff was examined by Robert Edward Driver, M.D. On examination, Dr. Driver noted that the Plaintiff had normal range of motion and strength and that she was alert and oriented with no focal neurological deficit observed as well as cooperative with appropriate mood and affect. Dr. Driver prescribed her antibiotics for the abscess and advised her to follow up in 48 hours. [T. 514].

The Plaintiff was 30 years old at the time of the ALJ hearing in July 2014. She obtained a GED and attended one year of college. [T. 34]. She testified that she was married and had three children in the home, ages 13, 11, and 9. She last worked in October 2009. The only other earnings she had after that time was when she did some babysitting for her mother-in-law for approximately three months in 2011. [T. 35].

The Plaintiff testified that she lost her Medicaid after her husband obtained a full-time job earning approximately $13.00 per hour. [T. 37-38, 58]. During the time period when the Plaintiff was covered by Medicaid, she was prescribed a number of medications, including Ampyra for balance and walking; Nudexta for PBA; Amantadine for symptoms associated with multiple sclerosis; as well as another prescribed drug for chronic fatigue. [T. 51]. The Plaintiff's attorney advised the ALJ that she no longer takes the prescribed medications because she cannot afford them at this time. [T. 51].

Since she lost Medicaid, the Plaintiff testified that she reapplied for Medicaid multiple times, and that she tried to receive benefits under her husband's insurance, the Good Samaritan clinic, and the Affordable Care Act ("AFA"). [T. 39]. She stated that she was waiting to hear back from the Good Samaritan clinic because the AFA was going to cost her $289 per month. [Id.]. When the ALJ asked her "[s]o what's the problem with that?" the Plaintiff stated she could not afford it and reiterated she had three children. [Id.].

The Plaintiff testified that without insurance, her MS medication costs approximately $6,000 per month and that she could not afford it. [T. 43]. She further testified that she unsuccessfully sought financial assistance from the company that manufactures her medications. [T. 43-44]. The ALJ

6

questioned the Plaintiff on her efforts to obtain assistance from the drug manufacturer, and the Plaintiff explained that she spoke to a representative on the telephone, but she was not advised to complete an application and that the company referred her back to Medicaid. [T. 44]. She further testified that she was unable to address this issue with her doctors as she was unable to see her doctors when she lost her Medicaid benefits, which she reapplied for several times without success. [T. 44-46]. When the ALJ advised the Plaintiff that he was able to easily locate patient assistance information from the drug manufacturer online, the Plaintiff told him that she does not have internet access and if her children require internet access for schoolwork, she takes them to a fast food restaurant that offers free wireless internet access. [T. 44-45].

## III. STANDARD OF REVIEW

The Court's review of a final decision of the Commissioner is limited to (1) whether substantial evidence supports the Commissioner's decision, see Richardson v. Perales, 402 U.S. 389, 401 (1971), and (2) whether the Commissioner applied the correct legal standards, Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

The Social Security Act provides that "[t]he findings of the Commissioner of any Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). The Fourth Circuit has defined "substantial evidence" as "more than a scintilla and [doing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986) (quoting Perales, 402 U.S. at 401).

The Court may not re-weigh the evidence or substitute its own judgment for that of the Commissioner, even if it disagrees with the Commissioner's decision, so long as there is substantial evidence in the record to support the final decision below. Hays, 907 F.2d at 1456; Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

## IV. THE SEQUENTIAL EVALUATION PROCESS

In determining whether or not a claimant is disabled, the ALJ follows a five-step sequential process. 20 C.F.R. §§ 404.1520, 416.920. If the claimant's case fails at any step, the ALJ does not go any further and benefits are denied. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995).

First, if the claimant is engaged in substantial gainful activity, the application is denied regardless of the medical condition, age, education, or

work experience of the applicant. 20 C.F.R. §§ 404.1520, 416.920. Second, the claimant must show a severe impairment. If the claimant does not show any impairment or combination thereof which significantly limits the claimant's physical or mental ability to perform work activities, then no severe impairment is shown and the claimant is not disabled. Id. Third, if the impairment meets or equals one of the listed impairments of Appendix 1, Subpart P, Regulation 4, the claimant is disabled regardless of age, education or work experience. Id. Fourth, if the impairment does not meet the criteria above but is still a severe impairment, then the ALJ reviews the claimant's residual functional capacity (RFC) and the physical and mental demands of work done in the past. If the claimant can still perform that work, then a finding of not disabled is mandated. Id. Fifth, if the claimant has a severe impairment but cannot perform past relevant work, then the ALJ will consider whether the applicant's residual functional capacity, age, education, and past work experience enable the performance of other work. If so, then the claimant is not disabled. Id.

## V.    THE ALJ'S DECISION

In addressing the Plaintiff's claim, the ALJ found that the Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2015, and that she has not engaged in substantial gainful activity since

the amended alleged onset date of October 25, 2011. [T. 16]. The ALJ then found that the medical evidence established that, from October 25, 2011 through August 30, 2013, the Plaintiff had the following severe impairments: relapsing remitting Multiple Sclerosis, degenerative disc disease, optic neuritis, fatigue, gait disturbance, and frequent migraine headaches. [Id.]. The ALJ determined that, from October 25, 2011 through August 30, 2013, none of Plaintiff's impairments, either singly or in combination, met or equaled a listing. [T. 17]. The ALJ then assessed the Plaintiff's residual functional capacity (RFC) [T. 17-19], finding that, from October 25, 2011 through August 30, 2013, the Plaintiff had the RFC to perform sedentary work with the following limitations:

> [The Plaintiff] was unable to stand or walk even 2 hours in an 8 hour day, and required unscheduled breaks every 30 minutes, used a cane, and could rarely lift 10 pounds. She would be off task 25% of the day, and would be absent from work approximately 4 or more days per month, due to fatigue, gait disturbance, and frequent headaches.

[T. 17]. In determining this RFC, the ALJ found that the Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were generally credible from October 25, 2011 through August 30, 2013. [T. 19]. He further accorded "great weight" to Dr. Conrad's April 2013 medical

source statement, in light of Dr. Conrad's expertise in neurology and his long-term treatment relationship with the Plaintiff. [Id.].

Based on this RFC, the ALJ then determined that, from October 25, 2011 through August 30, 2013, the Plaintiff could not perform any of her past relevant work as a care giver or yarn machine operator. [T. 19]. The ALJ further concluded that, from October 25, 2011 through August 30, 2013, and considering the Plaintiff's age, education, work experience, and RFC, there were no jobs that existed in significant numbers in the national economy that the Plaintiff could perform. [T. 19-20]. The ALJ therefore concluded that the Plaintiff was under a disability as defined by the Social Security Act from the amended alleged onset date through August 30, 2013. [T. 20].

The ALJ went on to find, however, that medical improvement had occurred as of August 31, 2013, and that such medical improvement was related to the ability to work because there had been an increase in the Plaintiff's RFC:

> [The Plaintiff's] record does not show any evidence of MS treatment after 8/30/2013, which would suggest [the Plaintiff's] condition improved at that time, despite her allegations that she no longer had insurance coverage. On 10/08/2013, [the Plaintiff] sought care for an acute itching and burning sensation on her neck, but all other systems showed normal functioning. She did not seek any further treatment until 02/17/2014, when [the Plaintiff] sought emergency care. Although she complained

11

> of lower abdominal pain, and back pain, no other problems were noted. Her most recent examination, on 04/08/2014, shows [the Plaintiff] had normal range of motion, normal eye function, and normal strength.

[T. 21 (citations to the record omitted)].

The ALJ then assessed the Plaintiff's RFC [T. 21-22], finding that, beginning August 31, 2013, the Plaintiff had the RFC to perform light work with the following limitations:

> [The Plaintiff] can only occasionally climb ladders, ropes, scaffold, and balance, stoop, kneel, crouch and crawl. She can frequently climb ramps and stairs. [The Plaintiff] should avoid concentrated exposure to hazards, such as dangerous machinery and unprotected heights. She needs a cane to ambulate.

[T. 21]. Based on this RFC, the ALJ then determined that the Plaintiff was still unable to perform her past relevant work. [T. 22]. The ALJ further concluded that, beginning August 31, 2013, and considering the Plaintiff's age, education, work experience, and RFC, there were jobs existing in significant numbers in the national economy that the Plaintiff could perform. [T. 22-23]. Accordingly, the ALJ concluded that the Plaintiff's disability ended on August 31, 2013. [T. 23].

## VI. DISCUSSION

The Plaintiff presents four primary assignments of error. Specifically, the Plaintiff argues: (1) that the ALJ performed an improper listing analysis; (2) that the ALJ improperly evaluated her credibility; (3) that the ALJ improperly evaluated the opinion evidence of record; and (4) that the ALJ erred in determining that the Plaintiff medically improved as of August 31, 2013. Because the Court concludes that the ALJ's finding of a medical improvement is not supported by substantial evidence, the Court will remand this case for further proceedings.

The Social Security regulations define "medical improvement" as "any decrease in the medical severity of [an] impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant] was disabled or continued to be disabled." 20 C.F.R. § 404.1594(a)(1). A finding of a decrease in medical severity "must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s)." Id.

Here, there are no "symptoms, signs and/or laboratory findings" in the record to support the ALJ's finding of a decrease in the medical severity of the Plaintiff's MS after August 30, 2013. Rather, the record shows that the Plaintiff lost her insurance and was no longer able to afford the specific

13

treatment required for her MS. While the Plaintiff sought emergency treatment during this period, the examining physicians did not do any exams related to the Plaintiff's conditions, outside of those for which she sought treatment. As such, the findings made by these physicians are not a sufficient basis for the ALJ to conclude that the Plaintiff's MS had improved. Moreover, these examinations were performed in an emergency room setting and appear to have been limited to the acute conditions for which the Plaintiff sought emergency treatment. Such examinations certainly were not for the purpose of determining the Plaintiff's ability to perform work-related functions. As such, these examinations, standing alone, do not constitute substantial evidence that her RFC had increased such that she was capable of substantial gainful activity.

In determining that the Plaintiff's MS was no longer severe, the ALJ found the Plaintiff's testimony regarding her attempts to find free or low cost medical care after the loss of her health insurance was "unconvincing." [T. 22]. Specifically, the ALJ noted: "If she was as bad as alleged, she would have made serious efforts to get free treatment, as well as MS medications through a patient assistance program (PAP), which are available, as discussed at the hearing." [Id.]. The Plaintiff, however, testified at length regarding her attempts to apply for Medicaid, to be added to her husband's

14

insurance, to seek insurance through the Affordable Care Act, and to seek treatment at the Good Samaritan Clinic. [T. 38-40, 44-46, 54-55]. The ALJ's finding that the Plaintiff failed to make "serious efforts" to seek treatment is simply not supported by the record.

Finally, the ALJ reasoned that because the Plaintiff did not seek emergency treatment for MS-related symptoms, her MS impairment was no longer severe as of August 30, 2013. [T. 22]. In so finding, however, the ALJ disregarded the fact that the Plaintiff has relapsing, remitting multiple sclerosis, a disease which by its very nature waxes and wanes. Crider v. Harris, 624 F.2d 15, 16 (4th Cir. 1980) (noting that "multiple sclerosis is not constant in its severity, being marked by remissions as well as exacerbations"). That the Plaintiff did not require emergency medical treatment during the few months between her insurance lapsing and the time of the ALJ hearing does not constitute substantial evidence of a medical improvement. Moreover, the record clearly establishes that the Plaintiff did not seek treatment for MS during this time because she simply could not afford it. As the Fourth Circuit has cautioned "it is as erroneous to consider the claimant's failure to seek treatment as a factor in the determination that her impairment is not severe as it would be to reach the ultimate conclusion that the claimant is not disabled because she failed to follow prescribed

15

treatment when that failure is justified by lack of funds." <u>Lovejoy v. Heckler</u>, 790 F.2d 114, 1117 (4th Cir. 1986). The Plaintiff should not be penalized for her failure to seek emergency medical care for her MS.

For all of these reasons, the Court is compelled to conclude that the ALJ's decision is not supported by substantial evidence and that a remand is required.

# O R D E R

Accordingly, **IT IS, THEREFORE, ORDERED** that the Defendant's Motion for Summary Judgment [Doc. 14] is **DENIED**, and the Plaintiff's Motion for Summary Judgment [Doc. 10] is **GRANTED**. Pursuant to the power of this Court to enter a judgment affirming, modifying or reversing the decision of the Commissioner under Sentence Four of 42 U.S.C. § 405(g), the decision of the Commissioner is **REVERSED** and this case is hereby **REMANDED** for further administrative proceedings consistent with this opinion.

A judgment shall be entered simultaneously herewith.

**IT IS SO ORDERED.**   Signed: September 25, 2017

Martin Reidinger
United States District Judge